IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| QA3 FINANCIAL CORP., QA3 FINANCIAL, LLC, QUANTUM INSURANCE DESIGN, LLC, and QA3, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | 8:12CV5 |
| v. | ) ) | |
| FINANCIAL NETWORK INVESTMENT CORPORATION, CETERA FINANCIAL GROUP, and MULTI-FINANCIAL SECURITIES CORPORATION, | ) ) ) ) ) ) | MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT |
| Defendants. | ) | |

On November 5, 2012, QA3 Financial Corp., QA3 Financial, LLC, Quantum Insurance Design, LLC, and QA3, LLC (collectively, "QA3" or "the plaintiffs") filed a four-count amended complaint against Financial Network Investment Corporation (FNIC), Cetera Financial Group, and Multi-Financial Securities Corporation (collectively, "the defendants"). Now before me is the defendants' motion to dismiss Counts I-III and part of Count IV pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 49.) For the following reasons, the defendants' motion will be granted in part.

## I.   BACKGROUND

The third amended complaint alleges as follows. QA3 Financial Corp. is an

Iowa Corporation with its principal place of business in Omaha, Nebraska. (Am. Compl. ¶ 2.) Prior to February 11, 2011, it was a registered broker-dealer with the Securities and Exchange Commission (SEC) and the Financial Investment Regulatory Association (FINRA), and it provided broker-dealer services to approximately 450 registered investment representatives on an independent contractor basis. (Id.) On February 11, 2011, it filed an action in the United States Bankruptcy Court for the District of Nebraska seeking reorganization under the bankruptcy laws. (Id.)

QA3 Financial, LLC is a Nebraska limited liability company with its principal place of business in Omaha, Nebraska. (Id. ¶ 3.) It was a registered investment advisor regulated by the SEC. (Id.) On June 14, 2011, it filed a petition in the United States Bankruptcy Court for the District of Nebraska seeking reorganization under the bankruptcy laws. (Id.)

Quantum Insurance Design, LLC is a Nebraska limited liability company with its principal place of business in Omaha, Nebraska. (Id. ¶ 4.) Its primary business was to market insurance products such as fixed income annuities. (Id.)

QA3, LLC is a Nebraska limited liability company with its principal place of business in Omaha, Nebraska. (Id. ¶ 5.) Its members are Stephen K. Wild and Teri Sue Shepherd, both of whom are Nebraska citizens. (Id.) It is the sole member of QA3 Financial, LLC and Quantum Insurance Design, LLC, and it is the sole owner of QA3 Financial Corp. (Id.) On March 11, 2011, QA3, LLC filed a petition in the United States Bankruptcy Court for the District of Nebraska seeking reorganization under the bankruptcy laws. (Id.)

FNIC is a foreign corporation with its principal place of business in El Segundo, California. (Id. ¶ 7.) At relevant times, it was a broker-dealer consisting of a network of 30 regions across the United States that includes over 2,400 financial

2

professionals.  (Id.)

Multi-Financial Securities Corporation (MFSC) is a foreign corporation with its principal place of business in Denver, Colorado.  (Id. ¶ 9.)  It serves as an entrepreneurial financial services firm.  (Id.)

Cetera Financial Group (Cetera) is a foreign corporation with its principal place of business in El Segundo, California.  (Id. ¶ 8.)  It sponsors three distinct broker-dealer platforms, including the defendants FNIC and MFSC, and it provides "comprehensive broker-dealer services, innovative technology, and competitive advisory programs for approximately 5,000 independent financial professionals and more than 700 financial institutions nationwide."  (Id.)

Sometime after September 2008, many FINRA arbitration claims were filed against QA3 Financial Corp. due to its sale of "alternative investments sponsored by issuers that either filed for bankruptcy or were placed in receivership by the SEC."  (Id. ¶ 13.  See also id. ¶ 15.)  Catlin Specialty Insurance Company (Catlin), which was the issuer of QA3 Financial Corp.'s professional services errors and omissions insurance policy in 2009, advised QA3 Financial Corp. "that all coverage for the securities arbitrations involving alternative investments would be capped at $1 million despite the fact that the aggregate policy limits on the endorsement page listed $7.5 million in coverage."  (Id. ¶ 15.)  Because its defense costs alone would exceed the $1 million limit, QA3 Financial Corp. entered into global settlement discussions with most of the claimants in the arbitrations and pursued negotiations with third parties in an attempt "to increase the net capital of QA3 Financial Corp. and to repay [debt] incurred by QA3, LLC."  (Id. ¶ 16.  See also id. ¶ 14 (alleging that defense costs would reduce the amount of insurance coverage available for indemnification).)  These efforts brought QA3 Financial Corp. into contact with FNIC.

On July 19, 2010, FNIC's investment banker contacted QA3 Financial Corp. "to arrange an introduction between Stephen K. Wild and Heather Jansen of QA3 and Mr. Handy, President and CEO of FNIC." (Id. ¶ 17.)  QA3 then began discussions with Handy "about a potential business relationship between QA3 and FNIC." (Id.) On September 24, 2010, FNIC's investment banker made its first due diligence request on behalf of FNIC, and QA3 representatives made arrangements to travel to FNIC's office in October 2010. (Id. ¶ 18.)  On October 28, 2010, FNIC and QA3 Financial Corp. signed a "Mutual Confidentiality and Non-Disclosure Agreement." (Id. ¶ 19.)  In doing so, the parties "understood the need to keep the negotiations confidential because any disclosure of the proposed affiliation would cause a mass solicitation of QA3 investment representatives and advisors by other broker dealers in the industry." (Id.)

On November 7, 2010, Handy and Valerie Brown, CEO of Cetera, "traveled to Omaha, Nebraska to discuss a possible business relationship." (Id. ¶ 20.)  It was proposed that FNIC would become "the registered broker-dealer for QA3 Financial Corp. investment representatives and QA3 Financial, LLC investment advisors who agreed to transfer their affiliations to FNIC." (Id. ¶ 21.)  "The contemplated transfer of representatives and advisors" would take place before February 1, 2011, to avoid "a potential net violation problem" that could arise if a pending arbitration case resulted in an adverse award. (Id.)  "As a critical element of the proposed relationship, FNIC agreed to provide necessary capital" to QA3. (Id.)  "In exchange, QA3 would work with its investment representatives and advisors on transferring their client base and association to FNIC." (Id.)  The parties envisioned that QA3 Financial Corp. would continue as a broker-dealer due to the ongoing securities arbitrations, but it "would wind down its operations as expeditiously as possible."

(Id.)  Also, the parties "contemplated the formation of a new FNIC regional Office of Supervisory Jurisdiction (OSJ)," which would be managed by "a core group of QA3's management" with financial support from FNIC.  (Id. ¶ 22.)

In early November 2010, Royal Alliance Associates, Inc. (Royal Alliance) was also interested in becoming the broker-dealer for QA3 Financial Corp. investment representatives.  (Id. ¶ 23.)  QA3 informed Handy and FNIC "that time was of the essence and if FNIC was not serious about completing a deal, FNIC should tell QA3 it was not interested."  (Id.)  In an email dated November 29, 2010, Handy "proposed" the following payments: $1 million to QA3, LLC; $1.25 million to the new Regional OSJ, amortized over seven years; $1.5 million in transition costs; $3 million to the new Regional OSJ in the form of bonuses; and $2 million in loans to investment representatives amortized over four years, for a total of $8,750,000.  (Id. ¶ 24.)  Under this "proposed relationship[,] approximately 65-70% of the QA3 Financial Corp. representatives and QA3 Financial, LLC investment advisors would be transferred to the new FNIC Regional OSJ, and the promised capital would allow QA3 Financial Corp. and QA3 Financial, LLC to deal with the pending arbitrations and provide service to the representatives and advisors who did not transfer to FNIC because of the pending arbitrations."  (Id. ¶ 25.)  Handy's email of November 29, 2010, "induced QA3 to discontinue discussions with Royal Alliance and not to contact other prospective buyers."  (Id.)

On December 8, 2010, Handy, Wild, Jansen, and legal representatives from FNIC and QA3 participated in a telephone conference to discuss "details surrounding the implementation of the proposal made by Mr. Handy" in the email of November 29, 2010.  (Id. ¶ 26.)  The participants discussed the arbitrations pending against QA3 Financial Corp. and the status of settlement talks, and FNIC's lawyers expressed

concern about successor liability.  (Id.)  After the conference, QA3's lawyers gave FNIC's lawyers citations to cases that provided guidelines for structuring the transaction to avoid successor liability.  (Id. ¶ 27.)

On December 13, 2010, Handy "specifically reiterated" that "FNIC would be providing upfront money to QA3 under the proposed relationship."  (Id. ¶ 28.)  Later that month, Handy "suddenly reduced the amount of the payment to QA3 to $2.5 million, but [he] continued to work with QA3 to meet the proposed schedule to have the representatives and advisors transferred to FNIC."  (Id. ¶ 29.)

On January 14, 2011, QA3 received notice of an interim award in a California arbitration which, if not satisfied, would create a net capital violation on February 14, 2011.  (Id. ¶ 30.)  QA3 then met with FINRA representatives to discuss the anticipated net capital violation.  (Id. ¶ 31.)  During this meeting, QA3 informed FINRA of "the proposed business relationship" with a broker-dealer without naming FNIC.  (Id. ¶ 32.)

On January 20, 2011, Handy "promised a draft agreement and the payment of $2.5 million to QA3."  (Id. ¶ 33.)  Then on January 26, Handy "gave QA3 permission to disclose FNIC's identity to FINRA, and FINRA requested a telephone conference be scheduled."  (Id. ¶ 34.)  During this telephone conference, "FNIC's lawyers falsely told FINRA that the lawyers had only recently been brought into the deal and left the impression that QA3 and FNIC were not close to reaching an agreement."  (Id. ¶ 35.)  Also, FNIC described the payment to QA3 as contingent on the "actual transfer of the QA3 Financial Corp. representatives."  (Id. ¶ 37.)  This was contrary to the previous discussions between QA3 and FNIC.  (Id.)  After the telephone conference, Jansen "expressed outrage to Mr. Handy that FNIC's lawyers had just created the impression that QA3 had been misrepresenting the status of the proposed transaction to FINRA

6

during other meetings." (Id. ¶ 36.)  Handy replied "that the lawyers were merely being careful because regulators were on the conference call." (Id.)

On January 28, 2011, Handy informed QA3 that "there was now a problem paying any money in advance," but he "believed the payment of $2.5 million could be made upon the transfer of the investment representatives from QA3 Financial Corp. to FNIC." (Id. ¶ 38.)

FNIC held a board meeting on or about February 3, 2011. (Id. ¶ 39.) It appears that sometime after this meeting, Handy informed QA3 that "FNIC still wanted to move forward, but the contract must be changed and provide for payment of a $1.5 million 'introductory fee' as if the fee were paid to a third party broker." (Id.) Handy "also explained that he was not able to offer employment to anyone in QA3 management." (Id.) In addition, Handy said "that one of his associates had gone through all of QA3's records and prepared a chart broken out by product for each QA3 Financial Corp. investment representative, and he contemplated an announcement going out to QA3 Financial Corp. representatives as soon as possible." (Id. ¶ 40.) "QA3 reluctantly accepted the watered down proposal because it was too late to explore other options." (Id. ¶ 41.)

On or about February 4, 2011, FNIC's lawyers circulated a draft agreement, and Handy indicated for the first time "that the payment of the $1.5 million 'introductory fee' could only be paid to QA3 Financial Corp., and could not be paid to QA3, LLC to be used to pay indebtedness as expressly referenced in prior discussions." (Id. ¶ 42.) QA3 representatives responded that the payment "had to be paid at the holding company level in order to pay indebtedness," but Handy replied that "the payment could only be made in the manner [stated in the] proposed contract." (Id. ¶ 43.)

On February 5, 2011, Handy left a voice message telling Wild "that he should be concerned about his legacy" and requesting that QA3 release FNIC from the October 28, 2010, confidentiality and non-disclosure agreement "to allow QA3 Financial Corp. investment representatives to transfer to FNIC," even though QA3 and FNIC failed to reach an agreement. (Id. ¶ 44.)

Because FNIC failed to "pay upfront money to alleviate QA3 Financial Corp.'s net capital problems and to pay indebtedness at the holding company level . . . QA3 Financial Corp. faced a net capital violation on February 14, 2011." (Id. ¶ 45.) "QA3 Financial Corp filed a Chapter 11 bankruptcy petition on February 11, 2011, and deregistered as a broker-dealer." (Id. ¶ 46.)

"On February 28, 2011, Cetera announced that 35 financial advisors formerly affiliated with QA3 Financial Corp. joined its family of independent broker-dealers." (Id. ¶ 47.) "Fifteen QA3 Financial Corp. representatives joined Defendant MFSC . . . , and the balance joined FNIC's BAR Financial Region." (Id.) QA3 alleges that Cetera, FNIC, and MFSC "recruited the financial advisors in violation of the Mutual Confidentiality and Non-Disclosure Agreement." (Id. ¶ 48.)

As noted above, the amended complaint includes four counts. In Count I, which is titled "Fraudulent Misrepresentation," QA3 alleges that on November 29, 2011, FNIC falsely represented through Handy that it would pay $2.5 million to QA3 "up front." (Id. ¶¶ 50-51.) It alleges further that "FNIC knew that the representation was false or recklessly made the representation without knowledge of its truth and as a positive assertion," that FNIC intended for QA3 to "rely on the representation and forgo seeking other business options," and that QA3 suffered damages because it "did in fact rely on FNIC's representations." (Id. ¶¶ 51-53.)

In Count II, which is titled "Fraudulent Concealment," QA3 alleges that from

8

November 29, 2010, to January 26, 2011, "FNIC knew that QA3 was relying on the fact the proposed relationship contemplated that upfront money would be paid, but [it] failed to disclose to QA3 that FNIC would not pay any money until the transfer of the investment representatives had been completed." (Id. ¶ 55.) It adds that FNIC had a duty to disclose that it would not pay upfront money to QA3; that QA3 could not have known through diligent attention, observation, and judgment that FNIC had no intention to pay upfront money; that FNIC's concealment was intended to induce QA3 to refrain from pursuing a relationship with another broker-dealer; and that due to FNIC's concealment, QA3 did not pursue negotiations with other broker-dealers. (See id. ¶¶ 56-60.)

Count III, titled "Negligent Misrepresentation," states that FNIC "supplied or furnished false information to QA3 for QA3's guidance in its business transactions"; that "FNIC failed to exercise reasonable care or competence in communicating the information"; that "QA3 reasonably relied on the false information supplied by FNIC"; and that QA3 suffered damages as a result of FNIC's negligent misrepresentations. (Id. ¶¶ 62-65.)

In Count IV, which is titled "Breach of Contract and Unlawful Enrichment," QA3 alleges that "[i]n recruiting QA3 Financial Corp. financial representatives and QA3 Financial, LLC investment advisors, Defendants breached the terms of the Mutual Confidentiality and Non-Disclosure Agreement by using the confidential information provided to FNIC." (Id. ¶ 67.) It also alleges that as a "result of Defendants' actions, Defendants Cetera, MESC [sic] and FNIC have received or will receive monies to which they are not entitled and for which it [sic] should be required to disgorge." (Id. ¶ 68.) Finally, QA3 alleges, "In reasonable reliance on the false information, QA3 did not pursue negotiations with other broker dealers and was

9

damaged as alleged." (Id. ¶ 69.)

The defendants have moved to dismiss Counts I-III in their entirety, adding that Count IV must be dismissed to the extent that it incorporates Counts I-III. (See generally Mot. to Dismiss, ECF No. 49.)

## II.   STANDARD OF REVIEW

"Federal Rule of Civil Procedure 8 requires that a complaint present 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Id. (quoting Twombly, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. (quoting Twombly, 550 U.S. at 557).  Also, although a court must accept as true all factual allegations when analyzing a Rule 12(b)(6) motion, it is not bound to accept as true legal conclusions that have been framed as factual allegations.  See id. ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  See also Cook v. ACS State & Local Solutions, Inc., 663 F.3d 989, 992 (8th Cir. 2011).

 "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678  (citation omitted).  "The plausibility

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557) (internal quotation marks omitted). In other words, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'–'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (brackets omitted).

## III.   ANALYSIS

The defendants argue that Counts I, II, and III must be dismissed in their entirety for three reasons: a) the plaintiffs have failed to allege facts establishing the elements of promissory fraud; b) the parties' negotiations failed to yield a final contract, and there was no "pre-contractual obligation to negotiate in good faith"; and c) the plaintiffs failed to plead "reasonable reliance." (See Defs.' Br. at 4-10, ECF No. 50.) The defendants also argue that Count IV must be dismissed insofar as it "blur[s] the distinction" between unjust enrichment and the claims stated in Counts I-III. (See id. at 10-11.) I shall consider each of the defendants' arguments in turn.

### A.   Promissory Fraud

The defendants argue first that Counts I, II, and III must each be dismissed because all three counts are based on "promissory fraud," and the plaintiffs have failed to allege the elements of promissory fraud. (See Defs.' Br. at 4-7, ECF No. 50.)

The defendants define "promissory fraud" as "a promise to do something in the future, which, at the time the promise is made, the speaker has no intention of actually

11

doing." (Defs.' Br. at 4, ECF No. 50.) I agree with the defendants that fraud claims of this nature are recognized under Nebraska law. See Alliance National Bank & Trust Co. v. State Surety Co., 390 N.W.2d 487, 493 (Neb. 1986) ("A promise, made by a promisor who has the intent not to perform such promise when made, may constitute fraud."). I also agree with the defendants that the amended complaint does not contain factual allegations sufficient to state a claim of promissory fraud. More specifically, I agree that the amended complaint does not allege the existence of a "promise," but merely a series of proposals made by the defendants during the course of negotiations that ultimately failed. (Cf. Mem. & Order (Smith Camp, C.J.) at 10-13, ECF No. 26 (holding that the plaintiffs' original complaint, which was based on the same facts, failed to state a promissory estoppel claim because the plaintiffs failed to allege that the defendants made a promise).) In addition, I doubt whether the amended complaint alleges facts showing plausibly that the defendants made proposals without any intent to reach an agreement. The amended complaint does allege that the defendants altered their positions during the course of negotiations and that no agreement was reached, but Nebraska law suggests that allegations of mere "nonperformance" are insufficient. Cf. Leichner v. First Trust Co. of Lincoln, 274 N.W. 475, 478 (Neb. 1937) (indicating that evidence of circumstances "other than that of nonperformance" of an agreement is needed to support an inference of fraudulent intent). In short, the defendants have persuaded me that the amended complaint fails to state a claim of promissory fraud upon which relief may be granted.

The defendants have not persuaded me, however, that Counts I, II, and III are not viable unless the plaintiffs can establish promissory fraud.

As noted above, Count I is based on the theory of fraudulent misrepresentation. "To state a claim for fraudulent misrepresentation, a plaintiff must allege (1) that a

representation was made; (2) that the representation was false; (3) <u>that when made,</u> <u>the representation was known to be false or made recklessly without knowledge of</u> <u>its truth and as a positive assertion</u>; (4) that the representation was made with the intention that the plaintiff should rely on it; (5) that the plaintiff did so rely on it; and (6) that the plaintiff suffered damage as a result." <u>Knights of Columbus Council 3152</u> <u>v. KFS BD, Inc.</u>, 791 N.W.2d 317, 331 (Neb. 2010) (footnote and citation omitted) (emphasis added). "To constitute a false representation, a statement must be made as a statement of fact, not merely the expression of an opinion." <u>Kliewer v. Wall</u> <u>Construction Co.</u>, 429 N.W.2d 373, 380 (Neb. 1988) (citations omitted). Moreover, fraud generally "cannot be based on predictions or expressions of mere possibilities in reference to future events." <u>Outlook Windows Partnership v. York International</u> <u>Corp.</u>, 112 F. Supp. 2d 877, 894 (D. Neb. 2000) (citing <u>NECO v. Larry Price &</u> <u>Associates</u>, 597 N.W.2d 602, 606 (Neb. 1999)). The instant case implicates this rule because the plaintiffs allege that the defendants misrepresented their intent to pay "upfront money" to QA3 at some point in the future. (<u>See</u> Am. Compl. ¶¶ 49-53, ECF No. 43.) The rule is not without exceptions, however. Most significantly for present purposes, "fraud may be predicated on the representation that an event, which is in control of the maker, will or will not take place in the future, if the representation as to the future event is known to be false when made or is made in reckless disregard as to its truthfulness or falsity and the other elements of fraud are present." <u>NECO</u>, 597 N.W.2d at 606-607 (citations omitted).[1] The <u>NECO</u> exception is similar to

---

[1] In <u>Outlook Windows Partnership</u>, the court discussed a second "recognized exception" to the general rule that applies when the alleged misrepresentation is a matter of the maker's opinion. <u>See</u> 112 F. Supp. 2d at 894. Neither party suggests that this exception applies in the instant case.

element (3), highlighted above, with the additional requirement that the future event "is in control of the maker."   According to the defendants, the NECO exception also corresponds to a claim of promissory fraud. (Defs.' Br. at 4, ECF No. 50.) I disagree.

As stated previously, a viable promissory fraud claim requires allegations of "a promise to do something in the future, which, at the time the promise was made, the speaker has no intention of actually doing." (Defs.' Br. at 4, ECF No. 50.)  In contrast, neither element (3) of a fraudulent misrepresentation claim nor the NECO exception depend on the existence of a promise, agreement, commitment, or contract; rather, a plaintiff need only allege a "representation." See Zawaideh v. Nebraska Department of Health and Human Services Regulation and Licensure, 825 N.W.2d 204, 212-13 (Neb. 2013) (noting that "none of the elements" of fraudulent misrepresentation or negligent misrepresentation "require an underlying contract," that "the true legal dispute for a misrepresentation cause of action is the tortious actions of the defendant," and that "fraud and deceit provide a ground for recovery that is independent of contract").  Furthermore, although fraudulent misrepresentation claims (and the NECO exception) can proceed based upon allegations that the representations were known to be false when made, they may also proceed based upon allegations that the representation was "made recklessly without knowledge of its truth." Id.; see also Knights of Columbus Council 3152, 791 N.W.2d at 331; NECO, 597 N.W.2d at 606-607.  The defendants have not argued that the plaintiffs have failed to allege a "representation," nor have they argued that the plaintiffs have failed to allege that a representation was "made recklessly without knowledge of its truth."   Instead, they merely argue (and I agree) that the narrower elements of promissory fraud have not been properly alleged.  It does not follow, however, that because the amended complaint fails to state a promissory fraud claim, it necessarily

14

fails to state a fraudulent misrepresentation claim under the <u>NECO</u> exception.

In short, it seems to me that the elements of fraudulent misrepresentation and the <u>NECO</u> exception are broader than the elements of promissory fraud; therefore, I am not convinced that the plaintiffs' failure to allege a viable promissory fraud claim is necessarily fatal to their fraudulent misrepresentation claim.

The defendants' attempt to re-frame Count II as a promissory fraud claim is also unpersuasive. "[T]o prove fraudulent concealment, a plaintiff must prove these elements: (1) The defendant had a duty to disclose a material fact; (2) the defendant, with knowledge of the material fact, concealed the fact; (3) the material fact was not within the plaintiff's reasonably diligent attention, observation, and judgment; (4) the defendant concealed the fact with the intention that the plaintiff act or refrain from acting in response to the concealment or suppression; (5) the plaintiff, reasonably relying on the fact or facts as the plaintiff believed them to be as the result of the concealment, acted or withheld action; and (6) the plaintiff was damaged by the plaintiff's action or inaction in response to the concealment." <u>Knights of Columbus Council 3152</u>, 791 N.W.2d at 331. The elements of promissory fraud (i.e., (1) a promise that (2) the speaker had no intention of keeping at the time it was made) do not appear among the elements of fraudulent concealment, and the defendants have not otherwise shown that the plaintiffs' fraudulent concealment claim can only proceed under a promissory fraud theory.[2]   Under the circumstances, I cannot

---

[2] The defendants argue that the plaintiffs' fraudulent concealment claim can only proceed as a promissory fraud claim because "fraud cannot be based on predictions or expressions of mere possibilities in reference to future events" unless the <u>NECO</u> exception is satisfied, and the <u>NECO</u> exception corresponds to a claim of promissory fraud. (<u>See</u> Def.'s Br. at 4, ECF No. 50 (quoting <u>Pawnee Co. Bank v. Droge</u>, 226 Neb. 314, 324 (1987)).)  As I explained in the preceding

conclude that the plaintiffs' failure to allege promissory fraud requires the dismissal of Count II.

Nor am I persuaded that Count III must be dismissed due to the plaintiffs' failure to state a claim of promissory fraud.  The Nebraska Supreme Court endorses the definition of negligent misrepresentation appearing in section 552 of the Restatement (Second) of Torts.  That section states, "One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."  Knights of Columbus Council 3152 v. KFS BD, Inc., 791 N.W.2d 317, 330 (Neb. 2010) (quoting Restatement (2d) of Torts § 552).  "Negligent misrepresentation has essentially the same elements of fraudulent misrepresentation with the exception of the defendant's mental state."  Zawaideh v. Nebraska Department of Health and Human Services Regulation and Licensure, 825 N.W.2d 204, 212 (Neb. 2013).

The defendants theorize that the plaintiffs' negligent misrepresentation claim must be dismissed because "statements that . . . relate to future events are not actionable as a matter of law" unless the NECO exception is satisfied; the NECO exception corresponds to a claim of promissory fraud; and the plaintiffs have not alleged facts sufficient to establish a plausible claim of promissory fraud. (See Def.'s Br. at 4, ECF No. 50.)  As I noted previously, I agree with the defendants that the plaintiffs' fraud claim "cannot be based on predictions or expressions of mere

paragraphs, however, the NECO exception is broader than promissory fraud, and the defendants' argument overlooks the disparities between the two.

possibilities in reference to future events" unless the <u>NECO</u> exception is satisfied. The defendants' argument that the plaintiffs' <u>negligent misrepresentation</u> claim also cannot proceed unless the <u>NECO</u> exception is satisfied stands on less-sure footing. None of the authorities cited by the defendant expressly holds that the <u>NECO</u> exception and the "general rule" it circumvents apply to negligent misrepresentation claims.  (<u>See</u> Defs.' Br. at 4, ECF No. 50 (citing <u>Kliewer v. Wall Construction Co.</u>, 429 N.W.2d 373, 380 (Neb. 1988) ("To constitute a false representation [for the purposes of a negligent misrepresentation claim], a statement must be made as a statement of fact, not merely the expression of opinion."); <u>Leichner v. First Trust Co. of Lincoln</u>, 274 N.W. 475, 478 (Neb. 1937) (discussing fraud (as opposed to negligent misrepresentation)); <u>Pawnee Co. Bank v. Droge</u>, 226 Neb. 314, 324, 411 N.W.2d 324, 330 (1987) (same); <u>NECO v. Larry Price & Associates</u>, 597 N.W.2d 602, 606 (Neb. 1999) (explaining that "[g]enerally, fraud cannot be based on expressions of mere possibilities in reference to future events," but "fraud may be predicated on the representation that an event, which is in control of the maker, will or will not take place in the future, if the representation as to the future event is known to be false when made or is made in reckless disregard as to its truthfulness or falsity and the other elements of fraud are present"); 1 Neb. Practice Series NJI2d Civ. 9.01).)[3]  That aside, even if I assume that negligent misrepresentation claims

---

[3] I note in passing that the <u>NECO</u> exception requires a showing that "the representation as to the future event is known to be false when made or is made in reckless disregard as to its truthfulness or falsity," 597 N.W.2d at 606, which is in tension with the principle that negligent misrepresentation does not require allegations that the defendant knew that his statement was false, <u>see</u> <u>Lucky 7, LLC v. THT Realty, LLC</u>, 775 N.W.2d 671, 675 (Neb. 2009) ("[T]he defendant's carelessness or negligence in ascertaining the statement's truth will suffice for negligent misrepresentation.").  In other words, imposing the <u>NECO</u> exception's

based on representations about future events must satisfy the <u>NECO</u> exception to remain viable, I have already concluded that the plaintiffs' failure to state a promissory fraud claim does not necessarily mean that the plaintiffs have failed to state a claim that falls within the <u>NECO</u> exception.

In summary, I am not persuaded that "Counts I-III can only be actionable as promissory fraud," and therefore I shall not dismiss Counts I-III for the reason that the plaintiffs "cannot plead the promise or intent elements" of promissory fraud. (Defs.' Br. at 7, ECF No. 50.)

## B.   Whether Relief Is Unavailable Due to the Lack of a Final Agreement or an Obligation to Negotiate in Good Faith

The defendants argue,

> Where negotiations concerning a commercial transaction break down, typical issues are (i) whether the negotiations were nonetheless final enough to form a contract to sell or purchase the thing in question, and (ii) whether there was a breach of any pre-contractual obligation to negotiate in good faith.  If the answer to both questions is "no," courts have refused to use fraud theories to grant any relief.
>
> The same analysis applies here.

(Defs.' Br. at 7-8, ECF No. 50 (citations omitted).)  None of the authorities cited by the defendants in support of this argument is controlling, and they offer little support for their position.

In <u>PFT Roberson, Inc. v. Volvo Trucks North America, Inc.</u>, 420 F.3d 728 (7th Cir. 2005), an operator of a fleet of trucks sued its supplier for breach of contract and fraud.  Only the breach of contract theory was submitted to the jury, which found in favor of the operator.  <u>Id.</u> at 729.  The supplier appealed the district court's denial of

---

requirements on a <u>negligent</u> misrepresentation claim would seem to convert the claim into one based on <u>fraudulent</u> misrepresentation.

its motion for judgment as a matter of law, and the operator cross-appealed the district court's refusal to submit its fraud theory to the jury.  The Seventh Circuit reversed, holding that "no contract had been reached," and the "dispute should have been resolved in [the supplier's] favor on summary judgment."  Id. at 732, 733.  On the issue of fraud, the court merely stated, "That conclusion [(i.e., that there was no contract)] makes it unnecessary to address [the operator's] argument that [the supplier] committed 'fraud' by proposing new or changed terms after December 6."  Id. at 733 (citation omitted).  In support of this point, the court cites Feldman v. Allegheney International, Inc., 850 F.2d 1217, 1223 (7th Cir. 1988), for the proposition that "self-interested negotiation does not show bad faith or fraudulent negotiation."  See PFT Roberson, Inc., 420 F.3d at 733.  Feldman, however, involved a plaintiff's breach of contract claim against a party to failed negotiations, and the court merely rejected the plaintiff's theory that by signing a letter of intent, the other party to the negotiations "acquired a duty to negotiate in good faith."  850 F.2d at 1223.  Neither case holds that claims of fraudulent misrepresentation, fraudulent concealment, or negligent misrepresentation can never proceed in the absence of a binding contract.  Nor do these cases hold that an agreement to negotiate in good faith is a prerequisite to any of the aforementioned claims.

Similarly, in Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 264 (2d Cir. 1984), which is also cited by the defendants, the Second Circuit rejected the plaintiffs' theory that the defendants breached a duty to negotiate in good faith because "whatever implied agreement to negotiate in good faith" that existed "was too indefinite to be enforceable under New York law."[4]  The case simply does not

---

[4] The court also affirmed the district court's dismissal of the plaintiffs' securities fraud claim, which was based on § 10(b) of the Securities and Exchange

support the defendant's theory that fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation claims cannot proceed in the absence of a binding contract or an agreement to negotiate in good faith.

Moreover, as I noted previously, the idea that fraudulent misrepresentation and negligent misrepresentation claims cannot proceed in the absence of a binding contract has been squarely rejected by the Nebraska Supreme Court.  See Zawaideh v. Nebraska Department of Health and Human Services Regulation and Licensure, 825 N.W.2d 204, 212 (Neb. 2013) ("The important thing to note is that none of the elements [of fraudulent or negligent misrepresentation] require an underlying contract.").  I see no indication that the court would apply a different rule to fraudulent concealment claims.

The defendants also refer me to Cimino v. FirsTier Bank, N.A., 530 N.W.2d 606, 616 (Neb. 1995), which holds that "in order for the implied covenant of good faith and fair dealing to apply, there must be in existence a legally enforceable contractual agreement," and to Precision Industries, Inc. v. Tyson Foods, Inc. , No. 8:09cv195, 2009 WL 4377558, at *1 (D. Neb. Nov. 25, 2009), wherein the court dismissed a plaintiff's claim "that the defendant breached the contract by failing to negotiate a contract extension in good faith."  (See Defs.' Br. at 8, ECF No. 50.) These cases are inapposite to the plaintiffs' tort claims.

Finaly, the defendants emphasize that the plaintiffs' claim for promissory estoppel has already been dismissed, and they suggest that Counts I-III should also be dismissed because "there is no factual, legal, or logical basis for a different result."

---

Act of 1934, 15 U.S.C. § 78j(b) (1982), partly because the defendant "did not enter into a contract."  727 F.2d at 265.  Because the plaintiffs in the instant case have not raised a securities fraud claim, this portion of the court's holding is inapposite.

(Defs.' Br. at 8, ECF No. 50.)  The promissory estoppel claims included in the original complaint were dismissed because the plaintiffs failed to allege that the defendants made a promise, (see Mem. & Order (Smith Camp, C.J.) at 10-13, ECF No. 26), but as I explained above in Part III.A., the defendants have not persuaded me that the existence of a promise is a necessary component of the plaintiffs' fraudulent misrepresentation, fraudulent concealment, or negligent misrepresentation claims. Thus, there is a clear "basis for a different result."

In short, the defendants have not shown that Counts I-III must be dismissed due to the absence of a contract, a promise, or an agreement to negotiate in good faith.

## C.   Reasonable Reliance

Next, the defendants argue that Counts I-III must be dismissed because this court has already concluded that the plaintiffs have failed to satisfy the element of "reasonable reliance."  (See Defs.' Br. at 8-10, ECF No. 50.)

I agree that "reasonable reliance" is an essential element of fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation. See Knights of Columbus Council 3152 v. KFS BD, Inc., 791 N.W.2d 317, 334 (Neb. 2010) (noting that fraudulent concealment requires proof that "the plaintiff, reasonably relying on the fact or facts as the plaintiff believed them to be as the result of the concealment, acted or withheld action"); Lucky 7, LLC v. THT Realty, LLC, 775 N.W.2d 671, 675-76 (Neb. 2009) ("So whether the plaintiff was justified in relying upon representations made by the defendant requires the same inquiry whether it is a fraudulent or negligent misrepresentation claim." (footnote omitted)). However, I disagree with the defendants' argument that this court's prior ruling establishes that the plaintiffs cannot show reasonable reliance.

 The plaintiffs' original complaint was based upon the same facts that are

21

alleged in the amended complaint, but it included a promissory estoppel claim (as opposed to misrepresentation and concealment claims). (See Compl. ¶¶ 49-55, ECF No. 1.) In a memorandum and order dated May 3, 2012, Chief Judge Laurie Smith Camp dismissed the plaintiffs' promissory estoppel claim with prejudice. (See Mem. & Order (Smith Camp, C.J.) at 10-13, ECF No. 26.) In support of her decision, she noted first that "to succeed on a promissory estoppel claim, a plaintiff must show 'that the promisor made a promise,' and that the plaintiff's 'reliance on the promise [was] reasonable and foreseeable.'" (Id. at 10 (quoting 168th and Dodge, LP v. Rave Reviews Cinemas, LLC, 501 F.3d 945, 955 (8th Cir. 2007)) (internal quotation marks omitted).) She then explained that the plaintiffs failed to state a promissory estoppel claim upon which relief may be granted because "[i]t cannot be inferred from the Complaint that FNIC made a 'promise' to the Plaintiffs upon which the Plaintiffs could reasonably rely." (Id. at 13.) In other words, the plaintiffs' promissory estoppel claim was dismissed because the plaintiffs failed to allege facts showing plausibly that a promise was made to the plaintiffs. Contrary to the defendants' assertion, Chief Judge Smith Camp did not make an alternate finding that even if a promise had been made, the plaintiffs failed to allege adequately that they reasonably and foreseeably relied on that promise. Thus, Chief Judge Smith Camp's order does not compel the conclusion that the plaintiffs are unable to satisfy the "reasonable reliance" element of their fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation claims.

### D.    The "Blurring" of Counts I-III with Count IV

Finally, the defendants argue that the portion of Count IV that alleges, "In reasonable reliance on the false information, QA3 did not pursue negotiations with other broker dealers and was damaged as alleged," (Am. Compl. ¶ 69, ECF No. 43),

fails to state an unjust enrichment claim because "QA3 does not allege how its alleged decision to forego other negotiations benefitted defendants," (Defs.' Br. at 11, ECF No. 50). The plaintiffs do not resist this argument, (see generally Pls.' Response Br., ECF No. 57), and I agree with the defendants that this component of Count IV does not state an unjust enrichment claim upon which relief may be granted. See, e.g., Abrahamson v. First National Bank of Holdrege, No. 4:05cv3039, 2006 WL 277109, at *6 (D. Neb. Feb. 3, 2006) ("Under Nebraska law, a party can recover on a claim for unjust enrichment only when 'benefits have been received and retained under such circumstances that it would be inequitable and unconscionable to permit the party receiving the benefits to avoid payment therefor.'" (citation omitted)).

In summary, I find that the plaintiffs have failed to state a viable unjust enrichment claim based on the theory that they were damaged by their decision to forego "negotiations with other broker dealers." (Am. Compl. ¶ 69, ECF No. 43.) I cannot dismiss Counts I-III based upon any of the arguments advanced by the defendants, however.

**IT IS THEREFORE ORDERED** that:

1.    The defendants' motion to dismiss, ECF No. 49, is granted in part.

2.    To the extent that Count IV alleges an unjust enrichment claim based on the theory that the plaintiffs were damaged by their decision not to pursue negotiations with other broker dealers, Count IV is dismissed for failure to state a claim upon which relief may be granted.

23

3.      In all other respects, the defendants' motion to dismiss is denied.

Dated March 19, 2013.

BY THE COURT

Warren K. Urbom
United States Senior District Judge

24