IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| QA3 FINANCIAL CORP., QA3 FINANCIAL, LLC, QUANTUM INSURANCE DESIGN, LLC, and QA3, LLC,<br><br>            Plaintiffs,<br><br>    vs.<br><br>FINANCIAL NETWORK INVESTMENT CORPORATION, CETERA FINANCIAL GROUP, and MULTI-FINANCIAL SECURITIES CORPORATION,<br><br>            Defendants. | 8:12CV5<br><br><br>MEMORANDUM AND ORDER |

This matter is before the court on the defendants' motion for summary judgment, [Filing No. 75](). This is an action for damages for fraudulent and negligent misrepresentation, fraudulent concealment, and breach of nondisclosure agreement and unjust enrichment in connection with a proposed business relationship.

During the period at issue, plaintiff QA3 Financial Corp. was a brokerage firm and plaintiff QA3 Financial, LLC, was an investment advisory firm. Plaintiff Quantum Insurance Design is an insurance agency and plaintiff QA3, LLC, is the holding company that owns these firms (hereinafter, collectively, "QA3"). Defendants Financial Network Investment Corp. and Multi-Financial Securities Corp are brokerage and advisory firms and are subsidiaries of defendant Cetera (hereinafter, collectively, "Financial Network").

In its Amended Complaint, QA3 claims that a during negotiations in November and December 2010, Financial Network fraudulently or negligently misrepresented that the parties would complete a transaction or agreement involving the transfer of broker-

dealers to Financial Network in exchange for a cash infusion to QA3 and fraudulently concealed the fact that it had no intention to complete the transaction.[1]  Rather, QA3 alleges that Financial Network intended to acquire QA3's broker-dealers without any payment to QA3.  QA3 also claims that it provided confidential information under a nondisclosure agreement to Financial Network as part of the negotiations, which it alleges was used to recruit the individuals who later joined Financial Network or another brokerage firm with which it is affiliated, resulting in unjust enrichment.[2]  In essence, QA3 contends that Financial Network engaged in negotiations to acquire QA3's broker-dealers in a transaction that would involve a cash infusion to QA3 in the amount of approximately $2.5 million, lulled QA3 into relying on the fact that negotiations were proceeding, then terminated the negotiations causing QA3 to cease operations.  Also, QA3 contends Financial Network later used the confidential information it had acquired in the negotiations to "poach" QA3's brokers.

Financial Network argues it is entitled to summary judgment contending that its representations were statements of nothing more than Financial Network's true, good faith intent to discuss the proposal.  It denies its statements were false and further argues it had no duty of disclosure and was not negligent.  Further, it argues that undisputed evidence shows that Financial Network did not disclose or use any

---

[1] The plaintiffs' factual allegations are set forth in greater detail in the court's order on defendants' motion to dismiss.  Filing No. 26, Memorandum and Order at 1-8.

[2] This court earlier found that "[to the extent that Count IV alleges an unjust enrichment claim based on the theory that the plaintiffs were damaged by their decision not to pursue negotiations with other broker dealers, Count IV is dismissed for failure to state a claim upon which relief may be granted."  Filing No. 60, Memorandum and Order at 23.  Plaintiffs' claim for unjust enrichment based on disclosure of confidential information remains.  See Filing No. 43, Amended Complaint at 13.

confidential information and those brokers who later joined Financial Network and another brokerage firm did so of their own volition.

## I. FACTS

The following facts are gleaned from the parties' respective statements of facts, Filing No. 76, Defendants' Brief at 3-15; Filing No. 78, plaintiffs' Brief at 2-9, 10-14; Filing No. 80, Reply Brief at 2-20.[3] The parties agree that in the wake of the financial crisis, QA3 increasingly became the target of FINRA arbitrations arising out of the involvement of some of QA3's representatives in the sale of certain alternative investments whose issuers either filed for bankruptcy or were placed in receivership. Given QA3's potential liabilities and uncertainty with respect to insurance coverage for the claims asserted, QA3 retained Moss Adams Capital to assist QA3 in finding a potential business partner for discussion of a transaction or affiliation designed to infuse QA3 with capital or otherwise bolster QA3 against its litigation, insurance, and financial difficulties. In this period, QA3 approached and began having discussions about a potential transaction or affiliation with Ameritas, Next Financial, Midland National/Sammons Securities, and Royal Alliance Associates.

In the fall of 2010, QA3 began negotiations with Financial Network.[4] Stephen K. Wild and Heather Jansen led the negotiations for QA3. Wild was the founder of QA3, one of two members of QA3, LLC (the holding company), and the chairman, CEO, and president of QA3 Financial Corp (the broker-dealer entity). Jansen was senior vice

---

[3] In conformity with the Local rules, the defendant has submitted a statement of undisputed facts consisting of 80 numbered paragraphs. Filing No. 76, Brief at 3-15. The plaintiffs dispute 51 of those paragraphs and submit a competing 27-paragraph statement of undisputed facts. Filing No. 78, Brief at 2-9, 10-14. The defendants largely dispute those facts. Filing No. 80, Reply Brief. Most undisputed facts are largely irrelevant.

[4] These negotiations are the subject of some disputes and are the heart of the lawsuit.

3

president and chief financial officer for QA3 Financial Corp. Wild and Jansen negotiated with Financial Network's president and CEO, Jack Handy, who led the negotiations on behalf of Financial Network. On October 28, 2010, Financial Network and QA3 signed a nondisclosure agreement.

Meanwhile, QA3 had also been negotiation with other potential partners or investors. Securities America was potentially willing to offer terms favorable to QA3, and during December 2010 and January 2011, QA3 and Securities America got "far along" in discussions over a potential transaction.

On January 14, 2011, a Financial Industry Regulatory Association ("FINRA") arbitration panel issued the an adverse ruling in *Cargill v. QA3 Financial Corp.,* resulting in a substantial award against QA3, which put it at imminent risk of a net capital violation. Shortly after that ruling, Securities America tabled its discussions with QA3 indefinitely, and Wild reached out to Handy by email to report a change of circumstances and to invite further discussions with Handy over the coming weekend.

Financial Network subsequently finalized, sought, and obtained approval for its $1.5 million proposal. It also sought advice of counsel with respect to Wild's request that payment be made to the QA3 holding company. On February 4, 2011, Handy informed Wild that Financial Network was not willing to structure the transaction so as to make the payment to the QA3 holding company because of concerns that it would be challenged and potentially invalidated as a fraudulent conveyance, but that it was otherwise willing to continue moving forward with the $1.5 million proposal, and was sending a letter agreement shortly. Financial Network and QA3 continued to discuss the issue of payment to the QA3 holding company through the course of the day without

reaching agreement. By the end of the day on February 4, 2011, QA3 had broken off negotiations, and publically announced that QA3 Financial Corp. was ceasing operations on February 11. On February 11, 2011, QA3 Financial Corp. (the broker-dealer entity) filed for bankruptcy protection and de-registered as a broker-dealer. QA3, LLC (the holding company), filed for bankruptcy on March 11, 2011.

In support of its motion, Financial Network submits Wild's deposition and Handy's declaration, as well as the declarations of several former QA3 employees or broker-dealers affiliated with QA3, with attached documentary evidence. Filing No. 77-1, Index of Evid., Ex. 1, Deposition of Stephen Wild ("Wild Dep."); Filing No. 77-5, Ex. 5, Declaration of Jack Handy ("Handy Decl."); Filing No. 77-6, Ex. 6, Declaration of Heather Jansen ("Jansen Decl."); Filing No. 77-7, Ex. 7, Kirby McDonald Declaration ("McDonald Declaration "); Filing No. 77-8, Ex. 8, Brett Harrison Declaration ("Harrison Declaration"); Filing No. 77-9, Ex. 9, Phillip Mottini Declaration ("Mottini Declaration"); Filing No. 77-10, Ex. 10, John Brackett Declaration ("Brackett Declaration"). In his declaration, Handy states that neither he nor anyone involved in negotiations on behalf of Financial Network "promised to reach an agreement with QA3 or represented that this would occur." *Id.*, Filing No. 77-5, Ex. 5, Handy Decl. at 5-6.

Heather Jansen, former senior vice-president and chief financial officer of QA3, states that she was involved in the negotiations, that Financial Network "never made any express promise of which I am aware to consummate a transaction with QA3" nor "sign a letter of intent or other agreement which would have, in my view, bound either side to a definitive transaction." *Id.*, Ex. 6, Jansen Decl. at 3. She also states that she

5

believes "that Financial Network and its representatives, including Jack Handy, negotiated with QA3 in good faith." *Id.* at 4.

Kirby McDonald, one of QA3's former brokers, states in his declaration that he discussed a potential affiliation with Financial Network with Jack Handy after QA3 ceased doing business and that during those discussions, Handy did not "say anything that suggested to me that he had or was using confidential information he had received from QA3." *Id.*, Ex. 7, McDonald Decl. at 2. Philip Mottini, another former QA3 broker, states essentially the same thing with respect to discussions with Handy and Financial Network as well as discussions with John Brackett and BAR Financial, the entity that Mottini and his group of brokers later joined. *Id.*, Ex. 9, Mottini Decl. at 2-3. Brett Harrison, President and CEO of defendant Multi-Financial Securities Corporation ("MFSC"), states that he discussed a potential affiliation with McDonald and that neither he "nor anyone else at MFSC had or used any information obtained by Financial Network in the QA3 negotiations with respect to any aspect of our discussions with the McDonald group, or the process that resulted in the McDonald group joining MFSC." *Id.*, Ex. 8, Harrison Decl. at 2. John Brackett states essentially the same thing with respect to his negotiations with Mottini. *Id.*, Ex. 10 at 2-3.

In opposition, QA3 submits the declaration of Stephen K. Wild, along with emails produced by defendants during discovery. Filing No. 79-1, Index of Evid., Ex. 1, Declaration of Stephen K. Wild ("Wild Decl."); Filing No. 79-2, Ex. 2, Affidavit of T. Dahlk, attached Exs. A-I (emails). In his declaration, Wild disputes Handy's contention that discussions with other broker-dealers ceased because of successor liability concerns, and states that he informed Financial Network in early December 2010 that

QA3 has ceased discussions with other potential suitors. *Id.*, Ex. 1, Wild Decl. at 1. Further he states that Financial Network and its affiliates agreed in the nondisclosure agreement not to solicit any investment representatives of QA3. *Id.* at 2. Thereafter, he states that QA3 provided Financial Network with voluminous confidential information including the names and contact information for QA3 representatives and their production numbers, products sold and compliance information, some of which was not publicly available information. *Id.* He outlines the various proposals discussed by the parties, and states that he believes Handy misrepresented Financial Network's intent to make a capital infusion, positioned itself to acquire the investment representatives for no fee and continually led him to believe QA3 would be paid the money necessary to pay bank debt and mitigate the net capital issues to satisfy regulatory concerns. *Id.* at 2-3, 10. He also states that the discussions between QA3 and Financial Network resumed before the *Cargill* arbitration decision was handed down January 14, 2011, as evidenced by a voicemail received from Jack Handy on January 12, 2011. Filing No. 79-1, Index of Evid., Wild Decl. at 5, Ex. A. Further, Wild states that Financial Network was aware of the debt obligation at the holding company level and was informed that payment would be made at the holding company level, and Financial Network represented to QA3 it would pay upfront money to QA3 as part of the transaction throughout the discussions. *Id.* at 8. Also, Wild submitted internal Financial Network emails that show that Financial Network instructed its employees not to continue planning activities with respect to the proposal on December 10, 2010, but this fact was not communicated to QA3. *Id.*, Ex. 1, Wild Decl. at 4; Ex. 2, Dahlk Aff., Ex. A, email correspondence at 2. Wild states that "Financial Network continually represented that

an agreement would be forthcoming and induced QA3 to delay re-instituting talks with other entities until it was too late." *Id.*, Ex. 1, Wild Decl. at 7-8; *see also* Filing No. 77-1, Index of Evid., Ex. 1, Wild Dep. at 118-121.

## II. LAW

The general rule is "that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, —- U.S. ——, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)) Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(a). A "genuine" issue of material fact exists "when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 251-52 (noting the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Id.* at 251.

"In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970) (finding that lower court had "failed to adhere to the axiom" that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor).

8

To prove a claim for fraudulent misrepresentation under Nebraska law, a plaintiff must show: (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that the representation was made with the intention that the plaintiff should rely on it; (5) that the plaintiff did so rely on it; and (6) that the plaintiff suffered damage as a result. *Brummels v. Tomasek*, 731 N.W.2d 585, 591 (Neb. 2007). To constitute fraud, a misrepresentation must be an assertion of fact, not merely an expression of opinion. *Ed Miller & Sons, Inc. v. Earl*, 502 N.W.2d 444, 452 (Neb. 1993) (involving a seller's statement of product's "first-class condition"). Hence, fraud cannot be predicated on mere "sales talk" or "puffing." *Id.* "Generally, fraud cannot be based on predictions or expressions of mere possibilities in reference to future events." *NECO v. Larry Price & Assoc.*, 597 N.W.2d 602, 606 (Neb. 1999)). An exception to the general rule exists when "the future event is within the control of the person making the representation." *Id.* at 606-07.

Negligent misrepresentation has essentially the same elements as fraudulent misrepresentation, with the exception of the defendant's mental state. *Lucky 7, L.L.C. v. THT Realty, L.L.C.*, 775 N.W.2d 671, 674 (Neb. 2009). While a fraudulent misrepresentation claim requires proof that the defendant knew the statement was untrue or was reckless as to whether the statements were true or false, negligent misrepresentation merely requires proof that the defendant failed to exercise reasonable care or competence to obtain or communicate true information. *Flamme v. Wolf Ins. Agency*, 476 N.W.2d at 809 (Neb. 1991) (Shanahan, J., concurring).

The difference between fraudulent misrepresentation and negligent misrepresentation is the duty required in each claim. *Gibb v. Citicorp Mortg., Inc.*, 518 N.W.2d 910, 921 (Neb. 1994). In fraudulent misrepresentation, one becomes liable for breaching the general duty of good faith or honesty. *Id.* However, in a claim of negligent misrepresentation, one may become liable even though acting honestly and in good faith if one fails to exercise the level of care required under the circumstances. *Id.*

The elements of fraud by concealment are: (1) that the defendant concealed or suppressed a material fact; (2) that the defendant had knowledge of this material fact; (3) that this material fact was not within the reasonably diligent attention, observation, and judgment of the plaintiff; (4) that the defendant suppressed or concealed this fact with the intention that the plaintiff be misled; (5) that the plaintiff was reasonably so misled; and (6) that the plaintiff suffered damage as a result. *Wilson v. Misko*, 508 N.W.2d 238, 250 (Neb. 1993).

The recipient of the information must prove he reasonably relied on it. *Cao v. Nguyen*, 607 N.W.2d 528, 532 (Neb. 2000). Whether a party's reliance upon a misrepresentation was reasonable is a question of fact. *Id.*; *InterCall, Inc. v. Egenera, Inc.*, 824 N.W.2d 12, 23 (Neb. 2012). Justifiable reliance must be determined on a case-by-case basis. *InterCall*, 824 N.W.2d at 23. In determining whether an individual reasonably relied on a misrepresentation, courts consider the totality of the circumstances, including the nature of the transaction; the form and materiality of the representation; the relationship of the parties; the respective intelligence, experience, age, and mental and physical condition of the parties; and their respective knowledge and means of knowledge. *Id.* at 23-24.

A party is justified in relying upon a representation made to the party as a positive statement of fact when an investigation would be required to ascertain its falsity. *Id.* at 23; *Fitl v. Strek*, 690 N.W.2d 605, 609 (Neb. 2005). While no action will lie where ordinary prudence would have prevented the deception, that rule is generally applied where the means of discovering the truth was in the hands of the party defrauded. *Schuelke v. Wilson*, 549 N.W.2d 176, 182 (1996). Although contracts are often the end result of the plaintiff's reliance on the defendant's misrepresentation, the true legal dispute for a misrepresentation cause of action is the tortious actions of the defendant. *Zawaideh v. Nebraska Dept. of Health and Human Servs. Regulation and Licensure,* 825 N.W.2d 204, 213 (Neb. 2013).

## III. DISCUSSION

The court finds there genuine issues of material fact that preclude summary judgment in this case. The court's review of the deposition testimony and declarations submitted in support of and against the defendants' motion shows that there are numerous issues of fact with respect to the nature and extent of the parties' knowledge, the reasonableness of reliance, the materiality of the information, and the parties' intent.[5] The plaintiffs have adequately controverted the evidence presented by the defendants. The plaintiffs have presented evidence, in the form of the defendants' internal emails, from which a reasonable jury could infer that at the time the representations were made, defendants had no intention of pursuing or completing the transaction and lulled the plaintiffs into a false sense of security and caused plaintiffs to

---

[5] The declarations submitted by the defendants in support of their motion are self-serving and are contradicted by the plaintiffs' evidence. A reasonable jury could discount the credibility of the plaintiffs' former brokers who are now employed by the defendant or its affiliates.

11

forego other opportunities. There are genuine issues of material fact as to whether the defendants provided oral assurances to plaintiffs that it would close on the transaction, whether the plaintiffs relied on such assurances, and whether such reliance was reasonable. The testimony of the negotiators is at odds with respect to what was said and when. Assessments of credibility are required to resolve the disputes.

The nature, extent, and reasonableness of the plaintiffs' reliance on the purported statements is a question of fact for the jury. Viewing the evidence and all inferences that can be derived therefrom in the light favorable to the plaintiffs, the court finds a reasonable juror could find in favor of the plaintiffs on their claims. The evidence must be viewed in the context of the relationship of the parties and other statements and conduct. In the context of this case, the defendants' statements could be construed as mere negotiating techniques, but could also be construed as positive assertions of intent to continue negotiations that arguably caused the plaintiffs to rely to their detriment on the defendants' representations.

On this record, the court is unable to find as a matter of law that the defendants are entitled to summary judgment on the plaintiffs' claims. Whether any statements amount to actionable misrepresentations is dependent on whether the statements were made with the intention that someone would rely on them, and whether that reliance was reasonable. That determination requires assessments of credibility and involves weighing of the evidence. Viewing the evidence in the light most favorable to the plaintiffs, the court finds there are genuine issues of material fact with respect to the existence, timing, extent and effect of the statements and the undisclosed information.

Accordingly, the court finds that the defendants' motion for summary judgment should be denied.

IT IS ORDERED:

1. Defendants' motion for summary judgment (Filing No. 75) is denied.

2. The parties shall contact Magistrate Judge Zwart's chambers within ten (10) days of the date of this order to schedule a conference addressing the further progression of this case.

Dated this 23rd day of June, 2014.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge